539 S.E.2d 446

**Anna SALE, By and Through Her Next Friend and Parents, June and William SALE; Katelyn Genevieve Kimmons, By and Through Her Next Friend and Parent, Rebecca Kimmons; Carol Freas, M.D.; Lealah Pollack, By and Through Her Next Friend and Parent, Carol Freas; and the American Civil Liberties Union of West Virginia, Petitioners Below, Appellants,**

v.

**Mayor Jay GOLDMAN, Mayor of the City of Charleston; Chief Jerry Riffe, the Chief of Police for the City of Charleston; and the City of Charleston, Respondents Below, Appellees,**

**Center For Community Interest And West Side Neighborhood Association, Intervenors Below, Appellees.**

No. 27315.

Supreme Court of Appeals of West Virginia.

Submitted June 7, 2000.

Decided July 19, 2000.

Dissenting Opinion of Justice Starcher July 20, 2000.

---

Jason E. Huber, Forman & Crane, L.C., Charleston, West Virginia, Attorney for the Appellants.

John R. Teare, Jr., Mark H. Dellinger, Bowles Rice McDavid Graff & Love, PLLC, Charleston, West Virginia, Attorney for the Appellees, Mayor of and Chief of Police for City of Charleston, and City of Charleston.

Michael W. Carey, Carey Hill & Douglas, PLLC, Charleston, West Virginia, Attorney for the Appellees, Center for Community Interest and West Side Neighborhood Association.

PER CURIAM:

This appeal was brought by Anna Sale, by and through her next friend and parents, June and William Sale, petitioners below/appellants [1] (hereinafter collectively referred to as "the Sales"), from a final order of the Circuit Court of Kanawha County finding a curfew ordinance promulgated and enforced by the City of Charleston, et al., respondents below/appellees [2] (hereinafter collectively referred to as the "City"), constitutional and valid under the laws of this State.[3] After a careful review of the briefs and record in this case, we affirm the circuit court's order.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The facts underlying this appeal are generally not disputed by the parties. On December 1, 1997, the City, through its City Council, adopted a "Youth Protection Ordinance."[4] The purpose of the ordinance includes the protection of minors from criminal victimization and exposure to criminal activity.[5] The ordinance carries out its purpose by imposing a curfew on juveniles under the age of eighteen. The curfew becomes effective at 10:00 p.m. on Sunday, Monday, Tuesday, Wednesday, and Thursday nights, and lasts until 6:00 a.m. the following mornings. On Saturday and Sunday mornings, i.e., Friday and Saturday nights, respectively, the curfew operates from 12:01 a.m. until 6:00

---

1. The other parties named as petitioners below and appellants herein were: Katelyn Genevieve Kimmons, by and through her next friend and parent, Rebecca Kimmons; Carol Freas, M.D.; Lealah Pollock, by and through her next friend and parent, Carol Freas; and the American Civil Liberties Union of West Virginia.

2. Other parties named as respondents below and appellees herein were: Mayor Jay Goldman, Mayor of the City of Charleston, and Chief Jerry Riffe, Chief of Police for the City of Charleston. Additionally, there were two intervenors below and appellees herein: City for Community Interest and West Side Neighborhood Association.

3. As pointed out in the body of the opinion, the circuit court found one provision of the ordinance to be unconstitutional and provided a remedy for that provision.

4. The terms of the ordinance were scheduled to be implemented on April 1, 1998. However, as a result of the proceedings underlying the instant appeal, the City of Charleston, by agreed order, postponed the ordinance's implementation pending the circuit court's resolution of this matter.

5. The purpose of the ordinance as set out in § 18–17(a) provides:

 The purpose of this ordinance is to protect juveniles from victimization and exposure to criminal activity by establishing a curfew for juveniles under the age of eighteen years in the City of Charleston. The Youth Protection Ordinance is intended to reinforce and promote the role of the parent in raising and guiding children, and promote the health, safety, and welfare of both juveniles and adults by creating an environment offering better protection and security for all concerned.

a.m. Numerous exceptions to these time limits include emergency situations and youngsters who are employed, emancipated, accompanied by their parents, or engaged in errands at their parents' direction. Further excluded from the curfew restriction are those minors who are exercising their constitutional right to freedom of speech, religion, and assembly and youth who are participating in activities sponsored by school, church, community, or government organizations. Finally, the ordinance allows affected individuals to apply for a permit to exempt them from the curfew's time limits for special circumstances not otherwise provided for therein, so long as the applicant has his/her parent's permission to participate or engage in the stated activity which has necessitated the exemption.

Violators of the curfew are subject to detention by law enforcement authorities and may be adjudicated delinquent. According to the Sales, curfew violators may be transported to their homes or to a holding facility until their parents can pick them up. In addition, those individuals, who assist or acquiesce in the minor's disregard of the stated time limits and who are found guilty of this infraction are guilty of a misdemeanor and subject to a fine not to exceed $500 and/or a jail sentence of not more than thirty days.

Perceiving the imposition of a curfew to be an impermissible infringement of their constitutional rights, the Sales instituted this civil action in the Circuit Court of Kanawha County on March 24, 1998, seeking to enjoin enforcement of the ordinance. The Sales alleged that the ordinance operates to deprive them of their constitutional rights to equal protection, freedom of speech and association, due process, and freedom from unreasonable searches and seizures. Furthermore, the Sales complained that the ordinance violates W. Va. Code § 49–5–8(b) [1997].[6] In addition, at least one parent/appellant complained that

the ordinance abrogated her constitutional right to parental privacy.[7]

Following discovery, the circuit court held a hearing in this matter on July 15, 1998. Thereafter, on May 20, 1999, the circuit court issued its decision, ordering:

1. That *Charleston City Code* § 18–17(d)(11) is unconstitutional insofar as the Charleston City Council delegated to the police chief its legislative authority to create exceptions to prohibitions of the curfew ordinance, giving unbridled discretion to the police chief to issue permits without providing any meaningful standards by which the police chief may exercise his or her authority.

2. That *Charleston City Code* § 18–17(d)(11) must be interpreted so as to eliminate any discretion on the part of the chief of police, by requiring him or her to issue a permit when a parent or guardian makes a determination that there is a reasonable necessity for his or her child or ward to be in a public place during curfew hours;

3. The ordinance does not violate juveniles' equal protection of the laws, even when subjected to strict scrutiny, and is not overbroad or impermissibly vague;

4. The ordinance does not interfere with parents' right to raise their children as they see fit, free from undue interference by the State;

5. The ordinance is not invalid because it does not provide for an arrest protocol;

6. The ordinance does not make parents criminally liable for the actions of their children;

7. The ordinance does not violate the Fourth Amendment right to be free from unreasonable search and seizure; and

8. The ordinance does not violate the provisions of W. Va. Code § 49–5–8(b).

Subsequent to the issuance of the circuit court's order, on May 24, 1999, the Sales moved the circuit court to continue the stay

---

6. Shortly after the occurrence of the events giving rise to the instant appeal, the Legislature rewrote W. Va. Code § 49–5–8. *See* W. Va. Code § 49–5–8(b) [1998] (changing circumstances under which juvenile may be taken into custody without satisfaction of statutory criteria from "warrant or court order" to "court order" only).

7. The caption on the pleadings reveal only one person, Carol Freas, as bringing a cause of action individually as a parent.

of the ordinance's operation to permit an appeal of the circuit court's decision to this Court. By order entered June 2, 1999, the circuit court denied the motion for a stay of the curfew's implementation. As a result of the circuit court's adverse rulings, the Sales similarly requested this Court stay the ordinance's institution pending an appeal of the circuit court's decision on the merits. By order entered June 9, 1999, we denied the requested stay. The Sales then filed this appeal. We now consider the assignments of error.

## II.

### STANDARD OF REVIEW

This case presents an appeal from a final order of the circuit court denying injunctive relief to the Sales, and raises one statutory issue and several constitutional challenges to the curfew ordinance in question. This Court indicated in *Phillip Leon M. v. Greenbrier County Board of Education,* 199 W.Va. 400, 404, 484 S.E.2d 909, 913 (1996), that "[b]ecause interpretations of the West Virginia Constitution, along with interpretations of statutes and rules, are primarily questions of law, we apply a *de novo* review." *See also* Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."). However, when, as here, an action is tried before a judge without a jury, the trial court's findings of fact "shall not be set aside unless clearly erroneous[.]" W. Va. R. Civ. P. 52(a). We have also held that

> [A] finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would

have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. pt. 1, in part, *In re Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996). *See also Woo v. Putnam County Bd. of Educ.,* 202 W.Va. 409, 412, 504 S.E.2d 644, 647 (1998) ("Reversal of a factual finding under the 'clearly erroneous' standard should not be done lightly.").

 This Court is also reminded that "[w]hen the constitutionality of a statute is questioned every reasonable construction of the statute must be resorted to by a court in order to sustain constitutionality, and any doubt must be resolved in favor of the constitutionality of the legislative enactment." Syl. pt. 3, *Willis v. O'Brien,* 151 W.Va. 628, 153 S.E.2d 178 (1967). *Accord* Syl. pt. 3, *Donley v. Bracken,* 192 W.Va. 383, 452 S.E.2d 699 (1994). Further, as was held in Syllabus point 1, in part, of *State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (1965), "[c]ourts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt." *Accord* Syl. pt. 4, *Tony P. Sellitti Constr. Co. v. Caryl,* 185 W.Va. 584, 408 S.E.2d 336 (1991). It is with the abovementioned standards in mind that we review the circuit court's order.

## III.

### DISCUSSION

#### A. Statutory Challenge Under W. Va.Code § 49-5-8

 The Sales first contend that the curfew ordinance violates W. Va.Code § 49-5-8(b) [1997],[8] which establishes very specific

---

8. W. Va.Code § 49-5-8(b) [1997] provides that

 [a]bsent a warrant or court order, a juvenile may be taken into custody by a law-enforcement official only if one of the following conditions exist: (1) Grounds exist for the arrest of an adult in identical circumstances; (2) emer-

gency conditions exist which in the judgment of the officer pose imminent danger to the health, safety and welfare of the juvenile; (3) the official has reasonable grounds to believe that the juvenile has left the care of his or her parents, guardian or custodian without the

and limited instances in which a law enforcement official may take a minor into custody without having a warrant or court order. The circuit court found that the ordinance did not violate this statute.

In support of this assignment of error, the Sales argue that because the ordinance authorizes Charleston City Police officers to take custody of juveniles who violate the ordinance, it contravenes the statute's clear intent to limit the instances in which a minor may be taken into custody without a warrant or court order. In response, the City asserts that the ordinance does not violate the statute because the statute pertains only to proceedings in which a juvenile petition has been filed and that it does not apply to other proceedings involving minors.

■ In this Court's analysis of W. Va. Code § 49–5–8(b), we are guided by the legal principle that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Compensation Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975). *See also Wriston v. Raleigh County Emergency Servs. Auth.*, 205 W.Va. 409, 417, 518 S.E.2d 650, 658 (1999) ("When this Court is called upon to construe a statute, our primary goal is to give effect to the intent of the Legislature." (citation omitted)). Moreover, "[i]n ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation." Syl. pt. 2, *Smith*, 159 W.Va. 108, 219 S.E.2d 361. Additionally, our case law admonishes us that "[s]tatutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments." Syl. pt. 3, *Smith, id. See also* Syl. pt. 5, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908) ("A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system

of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith."). After a thorough examination of W. Va.Code § 49–5–8(b) and other pertinent statutes, we conclude that the ordinance does not violate W. Va.Code § 49–5–8(b) for two reasons.

■ First, we believe municipalities have the authority to create curfew ordinances pursuant to W. Va.Code § 8–12–5(44) [1989].[9] This statute grants municipalities general authority to create ordinances "[t]o protect and promote the public morals, safety, health, welfare and good order." *Id.* In addition, the authority of municipalities to create curfew ordinances is implicitly recognized in the specific statutory authority of counties to create curfew ordinances. W. Va.Code § 7–1–12 [1988] states, in relevant part:

> [i]n addition to all other powers and duties now conferred by law upon county commissions, such commissions are hereby authorized, by order duly entered of record, to adopt an ordinance which establishes a curfew for persons under eighteen years of age. It shall be unlawful for any person under eighteen years of age to violate any ordinance: Provided, That *whenever the county ordinance enacted hereunder conflicts with that of any municipality, the municipal ordinance shall prevail.*

(Emphasis added). Furthermore, in proceedings involving juveniles, the Legislature has specifically granted municipal courts authority to prosecute violations of curfew ordinances by juveniles. W. Va.Code § 49–5–2(d) [1998] directs that, "[no]twithstanding any other provision of this article, municipal courts have concurrent juvenile jurisdiction

consent of such person, and the health, safety and welfare of the juvenile is endangered; (4) the juvenile is a fugitive from a lawful custody or commitment order of a juvenile court; or (5) the official has reasonable grounds to believe the juvenile to have been driving a motor vehicle with any amount of alcohol in his or her blood.

9. W. Va.Code § 8–12–5 [1989] has been amended, but these changes do not affect the statutory language at issue herein. *See* W. Va.Code § 8–12–5 [1999].

with the circuit court for a violation of ... *any municipal curfew ordinance* which is enforceable." (Emphasis added).[10]

In view of the legislative recognition that municipalities may create curfew ordinances, we do not believe the Legislature intended to prevent municipalities from enforcing such ordinances, which would be the necessary result were we to adopt the City's interpretation of W. Va.Code § 49–5–8(b). It is the "duty of this Court to avoid whenever possible a construction of a statute which leads to absurd, inconsistent, unjust or unreasonable results." *State v. Kerns,* 183 W.Va. 130, 135, 394 S.E.2d 532, 537 (1990).

Second, we believe that the enforcement of the curfew in this case is consistent with the restrictions of W. Va.Code § 49–5–8(b). This statute authorizes a juvenile to be taken into custody without a warrant or court order only under certain specified conditions. One of these conditions is when "[g]rounds exist for the arrest of an adult in identical circumstances[.]"[11] *See* Syl. pt. 4, *State v. Ellsworth,* 175 W.Va. 64, 331 S.E.2d 503 (1985) ("Under both W. Va.Code, 49–5–8(a) and – 8(b), the grounds for taking a juvenile into custody where the juvenile has allegedly committed a criminal act are the same as for the arrest of an adult."). Under this provision, a juvenile may be taken into custody without a warrant or court order for committing an offense in the presence of an officer, because an adult may be arrested without a warrant or court order for committing an offense in the presence of a police officer.[12] *See* Syl. pt. 3, *State v. Thomas,* 157 W.Va.

640, 203 S.E.2d 445 (1974) ("A municipal police officer has no authority, at common law or by statute, to make a warrantless arrest for a misdemeanor of a person who does not commit such an offense in his presence."). Similarly, in the case *sub judice,* the ordinance authorizes the police to take into custody, without a warrant or court order, any juvenile who violates the ordinance in the officer's presence. This authority is not inconsistent with W. Va.Code § 49–5–8(b). Therefore, we find that the circuit court was correct in finding the ordinance did not violate the statute.

### B. Due Process and Equal Protection Challenge

The Sales next argue that the ordinance violates the constitutional guarantees of due process and equal protection. We are urged by the Sales to analyze both of these constitutional guarantees under the "strict scrutiny" standard. The City requests this Court to apply the "rational basis" test.[13] In the proceedings underlying this appeal, the trial court resolved both constitutional issues against the Sales by utilizing a strict scrutiny analysis.

As a preliminary matter, we note that under the strict scrutiny test, "[i]f the challenged [law] affects the exercise of a fundamental right or is based upon a constitutionally suspect criterion, the law will not be sustained unless the [government] can prove that the classification is necessary to the accomplishment of a compelling state

---

10. The prior version of this statute likewise granted municipal courts jurisdiction over municipal curfew violations. *See* W. Va.Code § 49–5–2(d) [1996].

11. This provision of W. Va.Code § 49–5–8(b) is *nothing more than a recognition of the right of a police officer to take into custody, without a warrant or court order, anyone committing a felony or misdemeanor offense in the presence of the officer. See State v. Farmer,* 193 W.Va. 84, 89 n. 7, 454 S.E.2d 378, 383 n. 7 (1994) ("[A] peace officer may arrest without a warrant if there are reasonable grounds for him to believe that a felony has been committed; however, a peace officer may only arrest without a warrant if a misdemeanor is committed in his presence.").

12. We are aware that this provision applies only to the commission of an offense by a juvenile, which, if committed by an adult, would permit the arrest of the adult. However, the ordinance satisfies even this criterion because it creates a misdemeanor offense applicable to any adult who participates in a juvenile's violation of the ordinance.

13. There is a third level of constitutional review that is not involved in the issues presented by this case. *See* Syl. pt. 3, *Shelby J.S. v. George L.H.,* 181 W.Va. 154, 381 S.E.2d 269 (1989) ("Under equal protection principles, a statute which discriminates based on sex or illegitimacy must be substantially related to an important governmental objective. This test is one of intermediate scrutiny which rests between the 'rational basis' review and the 'strict scrutiny' test.").

interest." *Appalachian Power Co. v. State Tax Dep't,* 195 W.Va. 573, 594, 466 S.E.2d 424, 445 (1995) (citations omitted). Pursuant to the rational basis test, a law "will be sustained so long as it 'is rationally related to a legitimate state interest.'" *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985)). We will separately determine whether strict scrutiny or rational basis is the appropriate test for each of the two constitutional challenges.

**1. Due process challenge.** The Sales contend that the ordinance infringes upon their "fundamental right to free movement and association [and] is therefore subject to strict scrutiny."[14] This is a due process argument. The United States Supreme Court has interpreted "the Fifth and Fourteenth Amendments' guarantee of 'due process of law' to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores,* 507 U.S. 292, 301–02, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1, 16 (1993) (citations omitted). It has also been held that "constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Shapiro v. Thompson,* 394 U.S. 618, 629, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600, 612 (1969), *overruled in part on other grounds by Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). *See Spradling v. Hutchinson,* 162 W.Va. 768, 253 S.E.2d 371 (1979) (finding an employment residency requirement unconstitutional because it infringed upon the federal constitutional right to travel). *But see Morgan v. City of Wheeling,* 205 W.Va. 34, 516 S.E.2d 48 (1999) (finding an employment residency

requirement did not infringe upon the federal constitutional right to travel).

While the United States Supreme Court has recognized a general right to freedom of movement for adults, it has not specifically extended this right to juveniles. The City correctly acknowledges that the United States Supreme Court has specifically indicated that the right of freedom of movement for juveniles is subject to a different standard than that applicable to adults. In addressing a juvenile's interest in the freedom of movement during pretrial detention, the United States Supreme Court made the following observation:

> But that interest must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody.... Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae* .... In this respect, the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's "*parens patriae* interest in preserving and promoting the welfare of the child."

*Schall v. Martin,* 467 U.S. 253, 265, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207, 217–18 (1984) (quoting *Santosky v. Kramer,* 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599, 615 (1982)) (internal citations omitted).

Nevertheless, the Sales urge this Court to recognize that juveniles have a fundamental right to freedom of movement. In support of their argument, the Sales cite the decision in *Johnson v. City of Opelousas,* 658 F.2d 1065 (5th Cir.1981). We do not, however, interpret *Johnson* as recognizing that juveniles have a constitutional right to freedom of movement. *Johnson,* invalidated the curfew ordinance at issue in that case, by applying the "overbreadth doctrine."

**14.** Although the Sales provide a statement in their brief that they have a fundamental right to association, this issue was not briefed. In a footnote in their brief, the Sales acknowledge that "[i]t is not entirely clear if simply association for purely social purposes is constitutionally protected as a fundamental right." We have

held that "[a]ssignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived." Syl. pt. 6, *Addair v. Bryant,* 168 W.Va. 306, 284 S.E.2d 374 (1981). Consequently, we will not address the issue of whether a fundamental right to association exists or is infringed by the ordinance.

On the other hand, the City requests this Court to follow the decision in *Hutchins v. District of Columbia*, 188 F.3d 531 (D.C.Cir. 1999), to find that juveniles do not have a constitutional right to freedom of movement. In *Hutchins*, a federal district court found that a curfew ordinance violated the appellees' fundamental right to freedom of movement. On appeal, the appellate court acknowledged that if juveniles had a constitutional right to freedom of movement, then the "government impingement on a *substantive* fundamental right to free movement would be measured under a strict scrutiny standard and would be justified only if the infringement is narrowly tailored to serve a compelling state interest.... But does such a substantive right exist?" *Hutchins*, 188 F.3d at 536 (internal citations omitted).

The court of appeals in *Hutchins* answered its rhetorical question by finding that juveniles did not have a fundamental constitutional right to freedom of movement.

We are rather doubtful that substantive due process, those constitutional rights that stem from basic notions of ordered liberty "deeply rooted in [our] history and tradition," ... can be so lightly extended. On the other hand, we recognize that a hypothetical municipal restriction on the movement of its citizens, for example, a draconian curfew, might bring into play the concept of substantive due process.

Be that as it may, there is an important caveat to bear in mind when considering potential extensions of substantive due process, which "has at times been a treacherous field." ... The Supreme Court has warned us that our analysis must begin with a careful description of the asserted right for the more general is the right's description, *i.e.*, the free movement of people, the easier is the extension of substantive due process.... And the "doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." ... For that reason we must ask not whether Americans enjoy a general right of free movement, but rather whatever are the scope and dimensions of such a right (if it exists), do minors have such a sub-stantive right? Do they have the right to freely wander the streets—even at night? ...

We think that juveniles do not have a fundamental right to be on the streets at night without adult supervision. The Supreme Court has already rejected the idea that juveniles have a right to "come and go at will" because "juveniles, unlike adults, are always in some form of custody," ... and we see no reason why the asserted right here would fare any better. That the rights of juveniles are not necessarily coextensive with those of adults is undisputed, and "unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, *i.e.*, the right to come and go at will." ... While appellees claim that this reasoning obscures the difference between parental custody and governmental custody, appellees necessarily concede that juveniles are always in *some* form of custody. Not only is it anomalous to say that juveniles have a right to be unsupervised when they are always in some form of custody, but the recognition of such a right would fly in the face of the state's well-established powers of *parens patriae* in preserving and promoting the welfare of children. The state's authority over children's activities is unquestionably broader than that over like actions of adults.... And it would be inconsistent to find a fundamental right here, when the [Supreme] Court has concluded that the state may intrude upon the "freedom" of juveniles in a variety of similar circumstances without implicating fundamental rights....

Neither does the asserted right here have deep roots in our "history and tradition." As the District [Court] noted, juvenile curfews were not uncommon early in our history, ... nor are they uncommon now.... That juvenile curfews are common is, of course, not conclusive in determining whether they comport with due process, but the historical prevalence of such laws is "plainly worth considering" in determining whether the practice " 'offends some principle of justice so deeply rooted in the traditions and conscience of

our people as to be ranked as fundamental.'" ... In sum, neither history nor precedent supports the existence of a fundamental right for juveniles to be in a public place without adult supervision during curfew hours, and we decline to recognize one here.

188 F.3d at 538–39 (internal citations omitted)(footnote omitted).

We find the reasoning in *Hutchins* persuasive. Therefore, we decline to rule that juveniles have a constitutional right to freedom of movement. Accordingly, the rational basis test is the proper tool for determining whether the ordinance infringes upon the Sales' freedom of movement.[15]

■ Under the rational basis test, a law will be sustained so long as it "'is rationally related to a legitimate state interest.'" *Appalachian Power*, 195 W.Va. at 594, 466

**15.** Although we find it was error for the trial court to apply strict scrutiny to the due process and equal protections claims, we reach the same ultimate conclusion as the trial court, but for different reasons. As this Court held in Syllabus point 3 of *Barnett v. Wolfolk*, 149 W.Va. 246, 140 S.E.2d 466 (1965): "This Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment." *See also Easterling v. American Optical Corp.*, 207 W.Va. 123, 133–34, 529 S.E.2d 588, 598–99 (2000) ("Although we have found that the circuit court committed error by dismissing Buckeye on personal jurisdiction grounds, the claim against Buckeye must nevertheless be dismissed because of lack of subject matter jurisdiction."); *Murphy v. Smallridge*, 196 W.Va. 35, 36–37, 468 S.E.2d 167, 168–69 (1996) ("An appellate court is not limited to the legal grounds relied upon by the circuit court, but it may affirm or reverse a decision on any independently sufficient ground that has adequate support."); *McJunkin Corp. v. West Virginia Human Rights Comm'n*, 179 W.Va. 417, 423, 369 S.E.2d 720, 726 (1988) ("Although the circuit court's ruling in this matter was based on the insufficiency of the evidence on the record, this Court may uphold the circuit court's ruling on the ground we have cited above."); *Longwell v. Hodge*, 171 W.Va. 45, 47, 297 S.E.2d 820, 822 (1982) ("We agree with the Circuit Court, and affirm its decision, although for different reasons than those expressed by the lower court.").

**16.**

NUMBER OF JUVENILE ARRESTS IN
THE CITY OF CHARLESTON

S.E.2d at 445 (quoting *Cleburne Living Ctr., Inc.*, 473 U.S. at 440, 105 S.Ct. at 3254, 87 L.Ed.2d at 320). The Sales concede that the City has a legitimate interest in the welfare of juveniles. However, the Sales assert that there is no "evidentiary nexus between juvenile curfews and the purported goals of reducing juvenile crime and victimization[.]" The record shows differently. During the lower court proceedings, the City presented sufficient evidence to justify infringing upon the movement of juveniles during specific periods of time. The City's evidence establishes that there was a 27.40% increase in juvenile violent crimes and drug offenses during the period 1993–1996. The City also provided the trial court with statistical evidence showing a summary of the number of juveniles arrested[16] and victimized by crime[17] in the City of Charleston for each

JULY 1, 1995—OCTOBER 31, 1997

| Time of day | Number of Arrests |
|---|---|
| 12:00 a.m.—12:59 a.m. | 83 |
| 01:00 a.m.—01:59 a.m. | 50 |
| 02:00 a.m.—02:59 a.m. | 35 |
| 03:00 a.m.—03:59 a.m. | 20 |
| 04:00 a.m.—04:59 a.m. | 16 |
| 05:00 a.m.—05:59 a.m. | 9 |
| 06:00 a.m.—06:59 a.m. | 4 |
| 07:00 a.m.—07:59 a.m. | 2 |
| 08:00 a.m.—08:59 a.m. | 22 |
| 09:00 a.m.—09:59 a.m. | 17 |
| 10:00 a.m.—10:59 a.m. | 28 |
| 11:00 a.m.—11:59 a.m. | 44 |
| 12:00 p.m.—12:59 p.m. | 47 |
| 01:00 p.m.—01:59 p.m. | 57 |
| 02:00 p.m.—02:59 p.m. | 85 |
| 03:00 p.m.—03:59 p.m. | 89 |
| 04:00 p.m.—04:59 p.m. | 88 |
| 05:00 p.m.—05:59 p.m. | 83 |
| 06:00 p.m.—06:59 p.m. | 78 |
| 07:00 p.m.—07:59 p.m. | 105 |
| 08:00 p.m.—08:59 p.m. | 114 |
| 09:00 p.m.—09:59 p.m. | 89 |
| 10:00 p.m.—10:59 p.m. | 83 |
| 11:00 p.m.—11:59 p.m. | 68 |

**17.**

NUMBER OF JUVENILE CRIME VICTIMS
IN THE CITY OF CHARLESTON
JULY 1, 1995—OCTOBER 31, 1997

| Time of day | Number of Victims |
|---|---|
| 12:00 a.m.—12:59 a.m. | 106 |
| 01:00 a.m.—01:59 a.m. | 77 |
| 02:00 a.m.—02:59 a.m. | 50 |
| 03:00 a.m.—03:59 a.m. | 27 |
| 04:00 a.m.—04:59 a.m. | 28 |

hour of the day, from July 1, 1995, to October 31, 1997. There also was evidence demonstrating a reduction in juvenile arrests and victimization in selected cities which had implemented juvenile curfews. The Sales presented expert testimony disputing the effectiveness of curfews on juvenile crimes and juvenile victimization. However, the trial court did not find such testimony persuasive. Neither do we.

In sum, although the curfew ordinance infringes upon the freedom of movement of juveniles, it is rationally related to the City's legitimate interest in their welfare.

**2. Equal protection challenge.** The Sales further suggest that juveniles are unfairly discriminated against by the curfew ordinance because of their ages. Therefore, strict scrutiny should be used in examining the ordinance. This is an equal protection claim. We have held that "[t]he concept of equal protection of the laws is inherent in article three, section ten of the West Virginia Constitution[.]" Syl. pt. 3, in part, *Robertson v. Goldman*, 179 W.Va. 453, 369 S.E.2d 888 (1988). While we have recognized an equal protection guarantee under the state constitution, this Court has never recognized "youth" as a suspect classification for the purpose of a strict scrutiny analysis. As we have previously noted, "[t]he list of suspect criteria includes race, national origin, and alienage, and the scrutiny to be applied to laws that engage in such distinctions is the most exacting." *Appalachian Power Co. v. State Tax Dep't*, 195 W.Va. 573, 594, 466 S.E.2d 424, 445 (1995) (citation omitted).[18] *See also Morgan v. City of Wheeling*, 205 W.Va. 34, 43, 516 S.E.2d 48, 57 (1999) ("Concerning suspect or quasi-suspect criteria,

these categories include race, national origin, alienage, gender and illegitimacy, none of which are present here." (citation omitted)); *Israel by Israel v. West Virginia Secondary Sch. Activities Comm'n*, 182 W.Va. 454, 461, 388 S.E.2d 480, 487 (1989) ("Classifications relating to race, alienage, or national origin have always been subject to strict judicial scrutiny[.]"). Although the Sales invite this Court to extend the realm of suspect classifications to include "youth," we decline to do so. Thus, the rational basis test is the proper legal principle for determining whether the ordinance unfairly discriminates against the Sales.[19]

While we have determined that the rational basis test applies to a claim of discrimination based upon youth, we need not apply the test to the Sales' claim because we deem it waived. The sum total of the Sales' purported equal protection argument that is contained in the brief is as follows: "The ordinance treats all minors the same even though an exceedingly small percentage commit crimes. The [E]qual Protection Clause forbids such a crude grouping when fundamental rights are at stake, and limiting the curfew's hours and providing exceptions does not diminish this shortcoming." This purported constitutional legal argument is unacceptable for the purpose of review by this Court. "Issues not raised on appeal or merely mentioned in passing are deemed waived." *Tiernan v. Charleston Area Med. Ctr., Inc.*, 203 W.Va. 135, 140 n. 10, 506 S.E.2d 578, 583 n. 10 (1998).

### C. Vagueness Challenge

The Sales additionally contend that the curfew ordinance is unconstitutional-

| Time | Count |
| --- | --- |
| 05:00 a.m.—05:59 a.m. | 11 |
| 06:00 a.m.—06:59 a.m. | 14 |
| 07:00 a.m.—07:59 a.m. | 28 |
| 08:00 a.m.—08:59 a.m. | 49 |
| 09:00 a.m.—09:59 a.m. | 104 |
| 10:00 a.m.—10:59 a.m. | 98 |
| 11:00 a.m.—11:59 a.m. | 118 |
| 12:00 p.m.—12:59 p.m. | 141 |
| 01:00 p.m.—01:59 p.m. | 119 |
| 02:00 p.m.—02:59 p.m. | 152 |
| 03:00 p.m.—03:59 p.m. | 153 |
| 04:00 p.m.—04:59 p.m. | 193 |
| 05:00 p.m.—05:59 p.m. | 174 |
| 06:00 p.m.—06:59 p.m. | 195 |
| 07:00 p.m.—07:59 p.m. | 190 |
| 08:00 p.m.—08:59 p.m. | 224 |
| 09:00 p.m.—09:59 p.m. | 211 |
| 10:00 p.m.—10:59 p.m. | 174 |
| 11:00 p.m.—11:59 p.m. | 124 |

**18.** We note that under the West Virginia Human Rights Act, W. Va.Code § 5-11-1, *et seq.*, age has been made a suspect criterion only for persons aged 40 years or older. *See* W. Va.Code § 5-11-3(k) [1998] (defining "[t]he term 'age' . . . [as] the age of forty or above").

**19.** *See supra* note 15.

ly vague [20] because it does not provide adequate notice as to what constitutes an offense and because it contains undefined terms.[21] In the seminal case *of State v. Flinn,* 158 W.Va. 111, 208 S.E.2d 538 (1974), this Court articulated the standard applicable when a law is challenged as being unconstitutionally vague. We held, in Syllabus point 1, that "[a] criminal statute must be set out with sufficient definiteness to give a person of ordinary intelligence fair notice that his contemplated conduct is prohibited by statute and to provide adequate standards for adjudication." *Flinn,* 158 W.Va. 111, 208 S.E.2d 538. In Syllabus point 2 of *Flinn* we stated further "[s]tatutes involving a criminal penalty, which govern potential First Amendment freedoms or other similarly sensitive constitutional rights, are tested for certainty and definiteness by interpreting their meaning from the face of the statute." *Id.*

In the case *sub judice,* the Sales argued to the trial court that the ordinance was vague and impinged upon guarantees under the First Amendment of the federal constitution, "because juveniles would not have a clear concept of what activities are encompassed by the [ordinance's] exception and what activities would not be encompassed by the exception."

The curfew ordinance in question contains various exceptions to its application, including one for First Amendment activity being engaged in by juveniles. The circuit court found that the ordinance was not unconstitutionally vague with respect to the First Amendment exception:

Simply stated, any exception to a curfew ordinance that attempts to protect First Amendment rights is going to be somewhat vague, because the First Amendment is stated in general terms. It is through decisions of the courts that the limits of constitutional freedoms and limits of restrictions on those freedoms is determined. The Court cannot simply declare the ordinance unconstitutional because some, or even all, juveniles who may be affected by it are unaware of all of the limits and restrictions, as determined by court decisions. Stated differently, the fact that the ordinance may be vague because there are some gray areas does not render it unconstitutional in its entirety.

The circuit court supported its reasoning by relying on the decision in *Schleifer by Schleifer v. City of Charlottesville,* 159 F.3d 843 (4th Cir.1998), *cert. denied, Schleifer ex rel. Schleifer v. City of Charlottesville,* 526 U.S. 1018, 119 S.Ct. 1252, 143 L.Ed.2d 349 (1999). *Schleifer* involved a vagueness challenge to an ordinance that had a First Amendment exception "identical" to that provided by the City's ordinance in the instant case. In its rejection of the vagueness challenge, the appellate court in *Schleifer* held:

We decline to punish the City for its laudable effort to respect the First Amendment. . . . A broad exception from the curfew for such activities fortifies, rather than weakens, First Amendment values. . . . If councils draft an ordinance with exceptions, those exceptions are subject to a vagueness challenge. If they neglect to provide exceptions, then the or-

---

**20.** The Sales couch this argument in their brief in terms of a "vagueness and overbreadth" challenge. However, the brief does not articulate an "overbreadth doctrine" argument. In a footnote to their brief, the Sales state that "[v]agueness and overbreadth are related doctrines." While this may be true, the doctrines are independent of each other and require independent analyses. Because the Sales failed to provide a separate legal argument under the overbreadth doctrine, we will not address that issue in this appeal. *See Tiernan v. Charleston Area Med. Ctr., Inc.,* 203 W.Va. at 140 n. 10, 506 S.E.2d at 583 n. 10 (refusing to address arguments that were not briefed).

**21.** The Sales also assign error to the ordinance's lack of a *mens rea* requirement. In response

thereto, the City correctly points out that this issue was not presented to the trial court. Consequently, we will not address this issue for the first time on appeal. *See Shaffer v. Acme Limestone Co., Inc.,* 206 W.Va. 333, 349 n. 20, 524 S.E.2d 688, 704 n. 20 (1999) ("Our general rule is that nonjurisdictional questions not raised at the circuit court level, but raised for the first time on appeal, will not be considered.").

We also note that the Sales contend under their vagueness challenge that application of the ordinance "invites discriminatory enforcement." This argument is inappropriate and will not be considered because the challenge made to the ordinance by the Sales is a "facial" challenge.

dinance is attacked for not adequately protecting First Amendment freedoms. It hardly seems fitting, however, for courts to chastise elected bodies for protecting expressive activity. The Charlottesville ordinance is constitutionally stronger with that protection than without.

*Schleifer*, 159 F.3d at 853 (internal citation omitted) (footnote omitted).

We agree with the circuit court's reasoning and its reliance on *Schleifer*. The exception in the ordinance complained of states that it is not applicable to juveniles "[e]xercising First Amendment rights protected by the United States Constitution such as the free exercise of religion, freedom of speech, and the right of assembly." Undoubtedly there are gray areas in this exception, as attested to by the legion of judicial opinions in Anglo–American jurisprudence that have addressed First Amendment rights. The circuit court was, therefore, correct in finding that it is only through judicial case-by-case evaluations that the contours of the ordinance's First Amendment exception is to be tested and refined.

■■■ The Sales also contend that many of the terms in the ordinance are undefined, and therefore the ordinance is unconstitutionally vague. Some of the terms complained of include: "errand," "direct route," "establishment," "owner/operator," "public place," and "remain." The circuit court found that many of the terms challenged by the Sales were, in fact, expressly defined by the ordinance. For those terms that were not in fact defined, the circuit court found that the terms were not vague. Upon review of the terms that the ordinance does not define, we agree with the trial court that persons of ordinary intelligence know what the terms mean.

### D. Parental Rights Challenge

■■■ Lastly, it is argued by appellant Carol Freas (hereinafter referred to as "Dr. Freas"), that the ordinance unconstitutionally infringes upon her right to parental privacy, which includes the right to rear her child without undue governmental influence. It

has been recognized "that a parent's right to rear their children without undue governmental interference is a fundamental component of due process[.]" *Qutb v. Strauss*, 11 F.3d 488, 495 (5th Cir.1993) (citing *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)). However, it has been equally recognized that: "Not every state restriction of a child's freedom derivatively abridges the fundamental rights of parents. The [United States] Supreme Court has rejected the view that parents possess an unqualified right to raise children that trumps any governmental regulation of their children's conduct." *Schleifer*, 159 F.3d at 852.

The circuit court relied upon the decisions in *Qutb v. Strauss* and *Schleifer v. Charlottesville* to find that the ordinance's intrusion upon Dr. Freas' parental rights were minimal. The circuit court found

[t]he Charleston ordinance permits a juvenile to be or remain in a public place when accompanied by a parent, guardian or an adult who is 18 years of age, or older, who is authorized by the parent or guardian to take the parent's or guardian's place in accompanying the juvenile for a designated period of time and purpose. In this regard, the Charleston ordinance gives parents or guardians grater authority to permit their children to remain in public than did [the ordinance in *Qutb v. Strauss* ], and is virtually identical to the [ordinance in *Schleifer by Schleifer v. City of Charlottesville* ]. Further, when interpreted to eliminate the police chief's unbridled discretion to issue permits allowing juveniles to be in public places during curfew hours, and to allow parents or guardians to determine when reasonable necessity exists for juveniles in their care to be in public places during curfew hours, the ordinance does not interfere with parental rights.

■■■We agree with the finding of the circuit court and the decisions in *Qutb* and *Schleifer* that, while the ordinance does impact on Dr. Freas' parental rights, the impact is too minimal to constitute an unconstitutional infringement upon such rights.[22]

---

**22.** The Sales raise as a final issue that the ordi-

nance violates the constitutional prohibition

## IV.

### CONCLUSION

In view of the foregoing, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

Justice SCOTT did not participate.

Judge THORNSBURY sitting by temporary assignment.

STARCHER, Justice, dissenting:

(Filed July 20, 2000)

After working for more than 20 years as a circuit judge, where I focused on effectively responding to problems of juvenile abuse, victimization, crime, and delinquency, I am confident that the curfew of which the majority opinion approves is not only unconstitutional—it is also simply ineffectual political posturing and pandering—at the expense of the civil rights of young people and their parents.

The urge to scapegoat and stigmatize someone, anyone—for the larger shortcomings of our society, and especially how we treat our kids—finds regular expression in our juvenile justice system, just as it does in our larger criminal justice system. Hence, youth curfews.

While I disagree with Judge King's ultimate conclusion, in the decision that we are reviewing, to uphold the Charleston curfew—I appreciate very much the breadth and quality of Judge King's thoughtful and thorough legal opinion. He brought a remarkable level of jurisprudence and scholarship to his decision that fully elevated this issue to its proper importance.

I particularly appreciate and agree with Judge's King's application of "strict scrutiny" to the curfew in question. For the majority of this Court, then, to *retreat* from Judge King's "strict scrutiny" conclusion, is an inexplicable and unnecessary derogation of the rights of all West Virginians—including those West Virginians who are not yet the "magic age" of 18.

Fortunately, because the majority opinion is *per curiam*, the majority's chosen approach is not set in the firmest of jurisprudential cement. I hope that in the future this Court will recognize that strict scrutiny applies to the rights of young people to assemble, etc.—just as it does to the rights of other citizens.

With regard to the question of whether such a curfew is constitutionally sustainable, the legal reasoning of the majority is in clear tension with a more enlightened and progressive legal approach.

We need not look far to find a definitive expression of such an enlightened and progressive approach. For if we merely substitute "Charleston" for "Charlottesville," what Judge Blaine Michael of the United States Court of Appeals for the Fourth Circuit, a distinguished West Virginian, wrote in his dissent in *Schleifer v. City of Charlottesville,* 159 F.3d 843 (4th Cir.1998)—as set forth in full in the Appendix to this dissent—is one hundred per cent ˙applicable to the instant case.

I cannot improve on Judge Michael's writing (and what a job it would be to even summarize it!). I therefore set forth and subscribe to his reasoning as stating why I dissent to the constitutional reasoning of the *per curiam* majority opinion.

Finally, the police will make what use they will of the curfew that we have approved. After a while, it will probably gather dust in a drawer. I hope that until that happens, the police will be restrained, and that we will not see the curfew's application disproportionately to minority youth. I also hope that young people and their parents will take full advantage of the "First Amendment" provisions and protections of the curfew—because I think that in a passive-media-driven culture, actively asserting the right of freedom of expression is one of the best kinds of

against unreasonable searches and seizures. However, this assigned error is terse and lacks any authority to support it. We, therefore, agree with the City that "the Appellants' 'argument' in support of this assignment of error is not much larger than a footnote, and should be deemed waived." *See Tiernan v. Charleston Area Med. Ctr., Inc.,* 203 W.Va. at 140 n. 10, 506 S.E.2d at 583 n. 10 (refusing to address arguments that were not briefed).

practical education in citizenship that our children can have.

### APPENDIX

MICHAEL, Circuit Judge, dissenting in *Schleifer v. City of Charlottesville*, 159 F.3d 843 (4th Cir.1998).

Today, the majority relegates kids to second-class citizenship by upholding Charlottesville's nighttime curfew for minors. Forbidding children to go out at night affects their fundamental rights, and such a restriction can be valid only if it withstands strict scrutiny. The Charlottesville curfew ordinance fails the test because it sweeps too broadly and usurps rather than supports parental authority over child rearing. The ordinance has another constitutional defect as well. Although it is a crime to violate the ordinance, the crime is only vaguely defined. The curfew does not apply when minors are "exercising First Amendment rights." This exception is unconstitutionally vague, leaving children, their parents, and the police to guess whether particular conduct is punishable as a crime. I respectfully dissent.

The majority attempts to brush this dissent aside by claiming that under my approach "no curfew ever would pass constitutional muster," ante at 854–55. I can as easily say that under the majority's approach no curfew would ever fail constitutional muster. I'm afraid that my claim will be proven true. As long as the majority's standard is the law, a city council can pass a juvenile curfew as a routine measure because the justification is so easy to articulate. This should not stand under the Constitution. Children make up a quarter of our population, and their rights must not be ignored. A city council cannot order such a large segment of the community to stay at home for thirty-three hours of every week unless its curfew satisfies strict scrutiny. Subjecting Charlottesville's ordinance to this test does not subvert the "democratic authority" of the City Council, see ante at 854–55. On the contrary, the Council's authority must be exercised within constitutional bounds. The Council cannot, in the name of majority rule, take away constitutional rights of a minority, in this case all children under seventeen.

### I.

Charlottesville's curfew targets all unemancipated persons under seventeen and applies between the hours of 12:01 a.m. and 5:00 a.m. on week nights and 1:00 a.m. and 5:00 a.m. on Friday and Saturday nights (Saturday and Sunday mornings). See Charlottesville, Va., Code § 17–7(a), (b) (hereinafter City Code). The ordinance makes it unlawful for these minors to "remain" in public (including private property open to the public) during curfew hours unless one of the curfew's eight exceptions are met. See id. One of these exceptions allows a minor to remain in public when "the minor is exercising First Amendment rights protected by the United States Constitution, such as the free exercise of religion, freedom of speech and the right of assembly." Id. § 17–7(b)(8). A minor is also exempted from the curfew if he has written documentation that he is running an "errand" as directed by his parent and this document meets nine statutory criteria. See id. § 17–7(b)(6). [FN1] Minors who violate the curfew are subject to criminal punishment, and so are parents who "knowingly permit, allow or encourage" their children to defy the curfew. See id. § 17–7(c).

> FN1. The written document must contain the following information: (1) the minor's name; (2) the authorizing parent's name, (3) signature, (4) address, and (5) telephone number; (6) the telephone number where this parent may be reached during the pendency of the errand; (7) a "brief" description of the errand; (8) the minor's destination or destinations; and (9) "the hours the minor is authorized to be engaged in the errand." See City Code § 17–7(b)(6).

On March 10, 1997, Daniel Schleifer and four other minors, two adult parents of these minors, and an eighteen-year-old adult brought suit against the City of Charlottesville seeking a declaratory judgment that the curfew ordinance is unconstitutional. In district court the minor plaintiffs argued their case as a Fourteenth Amendment equal protection violation that implicates their fundamental rights, including First Amendment

and due process rights and the right to intrastate movement. The parent plaintiffs argued that the curfew's restrictions impermissibly burdened their due process right to exercise parental discretion and control over the rearing of their children by making the exercise of this discretion and control illegal. Finally, all plaintiffs challenged the statute as being void for vagueness under the Due Process Clause.[FN2] The district court ruled for the City on these claims after a trial on the merits. I would reverse on the grounds that the curfew violates the Equal Protection Clause and is void for vagueness.

> FN2. Like the majority, I read the plaintiffs' equal protection and due process claims as arising under the Fourteenth Amendment, rather than the Fifth Amendment as alleged in their complaint.

## II.

Because the curfew criminalizes conduct of persons under the age of seventeen, the City's use of this age-based classification is subject to the limitations of the Fourteenth Amendment's Equal Protection Clause. Generally, laws making age-based classifications are subject to rational basis review, see *Gregory v. Ashcroft*, 501 U.S. 452, 470, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313–14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), and thus are upheld if there is a rational relationship that ties the use of the classification to a legitimate governmental purpose, see *Heller v. Doe*, 509 U.S. 312, 319–21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). However, when an age-based classification affects fundamental rights, a court must review the classification with "the most exacting scrutiny." See *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (unanimous decision); see also *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 666, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990).

The Charlottesville curfew ordinance does implicate fundamental rights. Cf. *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (loitering statute implicates First Amendment liberties and "constitutional right to freedom of movement"); *Nunez v. City of San Diego*, 114 F.3d 935, 944–45 (9th Cir.1997) (holding that curfew infringed minors' fundamental rights). Normally, this would require the City to demonstrate that the ordinance satisfies strict scrutiny. However, because this case involves the fundamental rights of minors, and not those of adults, the majority concludes that equal protection requires only intermediate scrutiny. See ante at 846–47. I disagree. Like the Fifth and Ninth Circuits, I would hold that the Equal Protection Clause subjects to strict scrutiny all governmental classifications that impact fundamental constitutional rights. See *Nunez*, 114 F.3d at 945–46; *Qutb v. Strauss*, 11 F.3d 488, 492 & n. 6 (5th Cir.1993). Under this standard the Charlottesville curfew is unconstitutional.

## A.

Some mention of the unique status of children in our society is necessary to set the stage for the explanation of why strict scrutiny is necessary. The Supreme Court has long recognized that " '[c]hildren have a very special place in life which the law should reflect.' " *Bellotti v. Baird*, 443 U.S. 622, 633, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II*) (plurality opinion). Accordingly, the *Bellotti II* plurality identified certain factors that the Court has used to justify situations where "the constitutional rights of children cannot be equated with those of adults." *Id.* at 634, 99 S.Ct. 3035 (identifying the factors as "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing."). These factors reflect the view that "[t]he unique role in our society of the family ... requires that constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children." See *id.* at 633–34, 99 S.Ct. 3035. This focus on the family and the parent-child relationship is central in the Court's decisions and must be examined to understand when there is justification for concluding that a minor's constitutional rights are not coextensive with those of an adult.

The Supreme Court has consistently reflected the traditional Western concept of the family as a "unit with broad parental authority over minor children." See *Parham v. J.R.*, 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). Indeed, the Court's " 'constitutional interpretation has consistently recognized [that] parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society.' " *Bellotti II*, 443 U.S. at 638, 99 S.Ct. 3035 (quoting *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)). This authority is undoubtedly broad. When parental control comes into play, "unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, i.e., the right to come and go at will." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

However, a parent's broad authority does not generally carry over to the state. "[O]ur constitutional system long ago rejected any notion that a child is 'the mere creature of the State' and, on the contrary, asserted that parents generally 'have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations.' " *Parham*, 442 U.S. at 602, 99 S.Ct. 2493 (quoting *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)); see also *Bellotti II*, 443 U.S. at 637, 99 S.Ct. 3035; *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."). The Court has repeatedly said that it is " 'cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' " See *Bellotti II*, 443 U.S. at 638, 99 S.Ct. 3035 (alteration in original) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944)). This broad recognition of the parents' right to control the upbringing of their children and of constitutional deference to parental authority is linked to the parents' duty to raise and protect their children. See *Lehr v. Robertson*, 463 U.S. 248, 257–58, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Meyer v. Nebraska*, 262 U.S. 390, 400, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). This deference to parents rests on the strong presumptions that "natural bonds of affection lead parents to act in the best interests of their children" and that "parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." See *Parham*, 442 U.S. at 602, 603, 99 S.Ct. 2493; see also *Bellotti II*, 443 U.S. at 637, 99 S.Ct. 3035; *Yoder*, 406 U.S. at 232, 92 S.Ct. 1526.

Only in limited instances is the state able to assert a parent's broad power to control the activities of minors. For example, when the state acts as the legal guardian for a child, it will assume much, if not all, of a parent's traditional prerogatives. Similarly, the teachers and administrators of a public school will act "in loco parentis" while children are in their physical custody because parents " 'delegate part of [their] authority' " to the school by placing their children under its instruction. See *Vernonia*, 515 U.S. at 655, 115 S.Ct. 2386 (quoting 1 W. Blackstone, Commentaries on the Laws of England 441 (1769)); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); *id.* at 688, 106 S.Ct. 3159 (Brennan, J., concurring in the judgment). [FN3]

FN3. The majority overlooks *Vernonia's* real thrust by quoting it to suggest that a minor's constitutional rights with respect to the state are subject to "customary limitations," ante at 847, that "includ[e] even the right of liberty in its narrow sense, i.e., the right to come and go at will," *id.* (quoting *Vernonia*, 515 U.S. at 654, 115 S.Ct. 2386). Had the majority quoted the very next line in *Vernonia*, it would be obvious that the case makes clear that minors lack some of the most fundamental rights of self-determination with respect to their parents, not the state. See 515 U.S. at 654, 115 S.Ct. 2386 ("They are subject, even as to their physical freedom, to the control of their parents or guardians."). *Vernonia* repeatedly emphasized that a

minor's rights "vis-a-vis the State may depend on the individual's legal relationship with the State" and that "central" to the Court's decision was the fact that the children claiming a constitutional privacy right had "been committed to the temporary custody of the State as schoolmaster." See *id.* at 654, 115 S.Ct. 2386; see also *id.* at 655, 656, 662, 665, 115 S.Ct. 2386; cf. *Nunez*, 114 F.3d at 944–45 (rejecting as "out of context" the same quotation the majority uses from *Vernonia*).

In a similar way, the state (as parens patriae) may occasionally displace the parents' primary role in child rearing in order to protect a child's welfare. Thus, the state may trump parental discretion in delinquency proceedings (because parental control has already faltered), see *Schall v. Martin*, 467 U.S. 253, 265, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984); *In re Gault*, 387 U.S. 1, 17, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), or in situations where a child's "physical or mental health is jeopardized," see *Parham*, 442 U.S. at 603, 99 S.Ct. 2493; *Yoder*, 406 U.S. at 233–34, 92 S.Ct. 1526. In these circumstances, the strong presumption that parents are able and willing to act in the best interests of their children may be rebutted. See *Parham*, 442 U.S. at 602, 99 S.Ct. 2493. The state's power to displace parental discretion is limited, however, and must be justified on a case-by-case basis.

> That some parents "may at times be acting against the interests of their children" ... creates a basis for caution, but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests. The statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition.

*Id.* at 602–03, 99 S.Ct. 2493 (citations omitted). Indeed, "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id.* at 603, 99 S.Ct. 2493 (emphasis added). Thus, except in special circumstances, the state normally must defer to the exercise of a broad degree of parental discretion.

It is also clear that while the state does have an independent interest in the welfare of children, this interest may be superseded by the parents' right to exercise broad discretion in raising their children. See, e.g., *Yoder*, 406 U.S. at 229–30, 92 S.Ct. 1526; *Pierce*, 268 U.S. at 534–35, 45 S.Ct. 571; *Meyer*, 262 U.S. at 400, 43 S.Ct. 625. Consequently, the rights of minors in relation to the state must be analyzed to consider not only the interests of the minor and the state but also the interests of parents. Cf. *Parham*, 442 U.S. at 600, 99 S.Ct. 2493 (minor's "interest is inextricably linked with the parents' interest in and obligation for the welfare and health of the child"). Thus, the analysis of a minor's rights is complicated by the addition of this third party (a parent) who can bolster either the state's claim of authority or the minor's assertion of rights. Cf. *Yoder*, 406 U.S. at 231, 92 S.Ct. 1526 (recognizing that "competing interests of parents, children, and the State" requires additional analysis). [FN4]

> FN4. Recently, in *Reno v. ACLU*, 521 U.S. 844, 878, 117 S.Ct. 2329, 2348, 138 L.Ed.2d 874 (1997), the Court recognized that it is "clear that the strength of the government's interest in protecting minors is not equally strong" in all applications of the Communications Decency Act. Specifically, the Court indicated that the government's interest in protecting minors from indecent material would be greatly diminished where "a parent allow[s] her 17-year-old to use the family computer to obtain information on the Internet that she, in her parental judgment, deems appropriate." See *id.* (emphasis added).

Although the Court's language in *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), "taken at its broadest sweep" would lend support to the majority's expansive view of state power, *Prince* has limited application beyond its facts. See *Yoder*, 406 U.S. at 229, 92 S.Ct. 1526. *Prince*

involved a challenge to a conviction under a child labor law that made it criminal for parents to allow boys under the age of twelve and girls younger than eighteen to sell newspapers and similar items. See *Prince*, 321 U.S. at 160–61, 64 S.Ct. 438. The Court sustained the conviction of Mrs. Prince for taking her ward (and niece), a nine-year-old girl, with her to assist in selling religious literature during the evening hours. See *id.* at 161–62, 64 S.Ct. 438; *id.* at 171, 64 S.Ct. 438 (Murphy, J., dissenting); see also *Ginsberg*, 390 U.S. at 638–39, 88 S.Ct. 1274. The Court ruled that the state's interests in protecting the nine-year-old from psychological and physical harms that might result from Prince's activities were sufficient to justify the conviction. See 321 U.S. at 169–70, 64 S.Ct. 438. The Court was careful to state, however, that its decision did "not extend beyond the facts the case presents." See *id.* at 171, 64 S.Ct. 438. Accordingly, the Court has since limited *Prince's* application to situations where there is a " 'substantial threat' " of harm to the "physical or mental health of the child or to the public safety, peace, order, or welfare." See *Yoder*, 406 U.S. at 230, 92 S.Ct. 1526. In light of *Yoder* and the facts of *Prince*, I read *Prince* to allow a state to override parental discretion when the exercise of this discretion creates a substantial threat to the health and safety of children. In assessing this threat, *Prince* suggests that very young children are particularly vulnerable to harm.

This discussion underscores the Supreme Court's recognition of the special status of children and the predominance of the family unit. In particular, it underscores the Court's deference to the traditional authority of parents over the activities of their children. With this background, I now turn to the proper standard of scrutiny that must be applied in this case.

### B.

The minors' equal protection challenge in this case must be analyzed under strict scrutiny. This conclusion flows from the basic question the majority ignores. Why are the federal constitutional rights of persons who are defined as minors under state law different from those of adults? The answer is that a minor's constitutional rights are basically the same as those of adults, but in certain situations there may be "significant state interest[s] ... that [are] not present in the case of an adult" that will support a broader authority to regulate minors. See *Planned Parenthood v. Danforth*, 428 U.S. 52, 75, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).[FN5] When these interests justify regulation, they do so not because a minor's constitutional rights are always inferior to those of an adult but rather because the government's specific interests as regards minors are sometimes sufficient to allow a regulation to survive strict scrutiny. Accordingly, I would hold that the "fundamental rights" of minors are no less fundamental than those of adults and, thus, must be protected with the same vigor under a strict scrutiny analysis. See *Nunez*, 114 F.3d at 945.

> FN5. There are limited differences imbedded in our Constitution. For instance, the Twenty–Sixth Amendment guarantees the right to vote only to those eighteen and older. See U.S. Const. amend. XXVI.

### 1.

This conclusion is drawn from the Supreme Court's general approach to analyzing the rights of minors. The Court makes it clear that "[m]inors, as well as adults, are protected by the Constitution and possess constitutional rights." See *Danforth*, 428 U.S. at 74, 96 S.Ct. 2831; see also *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 511, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ("[s]tudents ... are 'persons' under our Constitution [who] are possessed of fundamental rights which the State must respect"); *In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) ("whatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone"). Indeed, the simple fact of age minority cannot by itself justify a dilution of constitutional protection. See *Bellotti v. Baird*, 443 U.S. 622, 633, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II*) (four-vote plurality opinion) ("A child, merely on account of his minority, is not beyond the pro-

tection of the Constitution."). Because "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority," *Danforth*, 428 U.S. at 74, 96 S.Ct. 2831 (emphasis added), all persons, regardless of age, possess these rights under our system. Cf. *Bellotti II*, 443 U.S. at 635, 99 S.Ct. 3035 ("children generally are protected by the same constitutional guarantees against governmental deprivations as are adults" (emphasis added)).

While minors generally possess the same rights against governmental deprivations as adults, considerations unique to minors can lend more weight to the government's interest in regulating this class. See *Nunez*, 114 F.3d at 945; *Qutb*, 11 F.3d at 492 n. 6. In *Bellotti II* a four-justice plurality noted that the Supreme Court has used three reasons to "justify[ ]" treating minors differently from adults under the Constitution: "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." 443 U.S. at 634, 99 S.Ct. 3035. If minors are to be accorded constitutional rights unequal to adults by reason of a particular regulation, these factors must support the government's assertion of greater authority. " 'It is only upon such a premise ... that a State may deprive children of ... rights [when a similar deprivation] would be constitutionally intolerable for adults.' " *Bellotti II*, 443 U.S. at 635 n. 13, 99 S.Ct. 3035 (quoting *Ginsberg*, 390 U.S. at 650, 88 S.Ct. 1274 (Stewart, J., concurring in the result)) (emphasis added).

The principle is illustrated by the Supreme Court's treatment of statutes forbidding a minor to obtain an abortion without parental consent. The Court has steadfastly insisted that such statutes must have a judicial bypass procedure. See, e.g., *Bellotti II*, 443 U.S. at 647–48, 99 S.Ct. 3035 (consent statute); *Danforth*, 428 U.S. at 72–75, 96 S.Ct. 2831 (same). The analysis used by the Court in *Danforth* is particularly instructive. After ruling that a spousal consent provision was unconstitutional, the Court addressed the statute's parental consent provision, saying that "much of what has been said above, with respect to [spousal consent], applies with equal force to [parental consent]." 428 U.S. at 74, 96 S.Ct. 2831. The Court explained that "[m]inors, as well as adults, are protected by the Constitution and possess constitutional rights." *Id.* However, it acknowledged that "the State has somewhat broader authority to regulate the activities of children than of adults." See *id.* Consequently, the Court explained: "It remains, then, to examine whether there is any significant state interest in conditioning an abortion on the consent of a parent ... that is not present in the case of an adult." See *id.* at 75, 96 S.Ct. 2831 (emphasis added). This analysis demonstrates that the Court did not assume that the state always possesses broader authority to regulate children. To the contrary, it looked to whether there were significant interests specific to minors that justified the law, indicating that the law would be unconstitutional if these interests did not provide sufficient support for broader authority to regulate minors. After examining the interests advanced by the state, the Court struck down the parental consent law because it lacked "sufficient justification." See *id.* at 75, 96 S.Ct. 2831.

The Court applied the same reasoning it used in *Danforth* to its subsequent parental consent cases. In *Bellotti II* the Court constructed its judicial bypass requirement to permit the consent undertaking to apply only to those minors who could justifiably be treated differently from adults. Thus, a bypass procedure must allow a minor to demonstrate that either (1) she is mature and informed enough to make the abortion decision herself or (2) the abortion is in her best interests. See *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 511, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) (*Akron II*); *Bellotti II*, 443 U.S. at 647–48, 99 S.Ct. 3035. First, the state's justification that minors generally are not able "to make critical decisions in an informed, mature manner," *Bellotti II*, 443 U.S. at 634, 99 S.Ct. 3035, is lost when a minor is adjudged mature and informed. Without the immaturity justification, the state has little reason to, and indeed cannot, require a parent's consent. Cf. *Danforth*, 428 U.S. at 75, 96 S.Ct. 2831 (parent's

interest in abortion decision is outweighed by mature minor's privacy right). Similarly, *Bellotti's* final consideration, that greater restrictions may be imposed on minors to reinforce the "importance of the parental role in child rearing," *Bellotti II*, 443 U.S. at 634, 99 S.Ct. 3035, is premised on the presumption that parents will discharge their "responsibility for [their] children's well-being." See *id.* at 638–39, 99 S.Ct. 3035. When a minor can demonstrate to a court that an abortion is in her best interests, the state's interest in involving the parents is reduced so much that the state can no longer require a minor to obtain parental consent. Therefore, when a minor is mature or an abortion is in her best interests, parental consent requirements are unconstitutional because the state's interests (specific to minors) do not justify a restriction that could not be applied to adults.

The parental consent example demonstrates that the government may sometimes, but not always, have interests in protecting minors that will allow it to impose special restrictions that narrow a minor's constitutional rights. It follows that courts must look at the regulation in question to determine if the state has sufficient justification to claim that a minor's rights are not the equal of an adult's. Only through this process can the state-defined age of majority have any significance insofar as constitutional rights are concerned.

### 2.

We know that we must evaluate the special interests that may justify a greater degree of governmental authority over minors in the context of the specific regulation. Still, the question remains as to which level of scrutiny is appropriate in cases involving constitutional rights. Logic compels that strict scrutiny apply.

It is clear from the discussion above that the majority's categorical approach is wrong. The majority would apply intermediate scrutiny in all cases involving minors, even those in which the government has no justification specific to minors for infringing upon their fundamental rights. In the latter situation the governmental interest in regulating minors under the majority's approach is identi-

cal to its interest in regulating adults. Yet the rights of minors could still be treated differently because their "fundamental" rights are not protected with strict scrutiny review. This has far ranging implications. Legislative bodies can pass many laws regulating conduct that would pass intermediate scrutiny but fail strict scrutiny. Under the majority's approach, such laws could be applied to all minors but could not be applied to any adults (whose fundamental rights are protected by strict scrutiny), even though the government had no reason to regulate minors any more than it did adults. The majority's holding, therefore, allows a minor to be deprived of constitutional rights when a similar deprivation would be constitutionally intolerable for adults, even though the state lacks any reason for different treatment. This result cannot be justified and essentially creates a second-class citizenship for all persons under the age of majority. For these persons, federal constitutional rights will "mature and come into being magically only when [they] attain[ ] the state-defined age of majority," *Danforth*, 428 U.S. at 74, 96 S.Ct. 2831.[FN6]

> FN6. Although I disagree with the details of the approach taken by the district court, its analysis properly focused on the existence or absence of interests specific to minors that would justify "accord[ing] the state more regulatory latitude in governing children in certain circumstances." *Schleifer v. City of Charlottesville*, 963 F.Supp. 534, 541 (W.D.Va.1997) (preliminary injunction analysis that was adopted in final ruling) (emphasis added). Under its approach, only "[w]hen the *Bellotti* factors ... cut in favor of increased state oversight" will intermediate, rather than strict, scrutiny apply. See *id.* at 541–42.

Moreover, the majority's approach is completely inconsistent with the Supreme Court's decisions on parental consent in the abortion context. As discussed above, the state cannot constitutionally regulate a minor's abortion rights by requiring parental consent unless the regulation provides a judicial bypass. The majority's holding, however, would allow the state to regulate a minor's abortion rights if the state's regulation

" 'is substantially related' to 'important' governmental interests," ante at 847. Such a result is clearly at odds with the Supreme Court's approach, as the state always has an important interest in regulating abortions. Beginning with *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court has repeatedly recognized the state's "important and legitimate interest in protecting the potentiality of human life." *Id.* at 162, 93 S.Ct. 705. See also *Planned Parenthood v. Casey,* 505 U.S. 833, 871, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Harris v. McRae,* 448 U.S. 297, 324–25, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). This interest by itself would enable state abortion statutes to meet intermediate scrutiny. Therefore, the majority's holding that intermediate scrutiny should apply to the regulation of minors simply cannot be squared with the Supreme Court's insistence that a state cannot require a mature minor to obtain parental consent for an abortion. Indeed, if the majority was correct, the state could completely ban abortions for women under the age of eighteen. This confirms the fallacy of applying intermediate scrutiny to cases involving the fundamental rights of minors.

I would avoid these difficulties by applying strict scrutiny to all equal protection challenges involving fundamental rights, regardless of whether minors or adults are involved. Under this approach, minors must be treated the same as adults whenever the government lacks interests specific to minors to support more restrictive regulatory authority over them. Cf. *Bellotti II,* 443 U.S. at 635 n. 13, 99 S.Ct. 3035; *Danforth,* 428 U.S. at 74–75, 96 S.Ct. 2831. However, when circumstances trigger governmental interests that are particular to minors, these interests, when coupled with the government's other interests, can make the government's claim for greater restrictions on minors much stronger. If these interests taken as a whole are compelling, the government's regulation (if narrowly tailored) will survive strict scrutiny with respect to minors, even though it would fail the test in the case of adults. See *Nunez,* 114 F.3d at 945 ("the *Bellotti* framework enables courts to determine whether the state has a

compelling interest justifying greater restrictions on minors than on adults"); *Qutb,* 11 F.3d at 492 n. 6 (same). This approach therefore provides a principled approach for deciding when children may be treated differently from adults for constitutional purposes. [FN7]

> FN7. The majority relies on the plurality opinion in *Carey v. Population Services International,* 431 U.S. 678, 691–99, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), to support its argument that the Charlottesville curfew should be subjected to less than strict scrutiny. See ante at 847. *Carey* is a slender reed for this proposition. First, *Carey's* plurality opinion was decided before *Bellotti II,* and later cases have followed the reasoning of *Bellotti II.* Second, *Carey* itself is best read as a recognition that the state's unique and significant interests in regulating children will make it easier to justify greater restrictions on minors than on adults. See *Carey,* 431 U.S. at 693, 97 S.Ct. 2010 (plurality opinion).

The Fifth and Ninth Circuits adopt this approach and analyze minors' equal protection challenges with strict scrutiny when fundamental rights are implicated. See *Nunez,* 114 F.3d at 945–46; *Qutb,* 11 F.3d at 492 & n. 6; cf. *Hutchins v. District of Columbia,* 144 F.3d 798, 805–10 (D.C.Cir.1998) (opinion of Rogers, J.) (intermediate scrutiny); *id.* at 825–27 (Tatel, J., concurring in the judgment) (strict scrutiny); *id.* at 828 (Silberman, J., dissenting) (finding that no fundamental right was affected by curfew and therefore applying rational basis review to age-based equal protection challenge). [FN8] I would join these circuits and hold that the Equal Protection Clause subjects all governmental classifications impacting on the fundamental constitutional rights of minors to strict scrutiny.

> FN8. *Reno v. Flores,* 507 U.S. 292, 301–05, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993), indicates that strict scrutiny should apply when the fundamental rights of minors are involved. In *Flores* a class of minors challenged an INS regulation that requires juvenile aliens to be placed in institutional group care facilities dur-

ing the pendency of deportation proceedings if a guardian or adult relative is not available to take custody. The Court recognized that strict scrutiny applies "when fundamental rights are involved," see *id.* at 302, 305, 113 S.Ct. 1439, but it rejected the minors' due process claim because it found that no fundamental right existed under the circumstances of the case. See *id.* at 305, 113 S.Ct. 1439; cf. *id.* at 304, 113 S.Ct. 1439 (stating that "the child's fundamental rights must not be impaired" by INS). The approach adopted by the Fifth and Ninth Circuits is therefore consistent with *Flores'* implication that strict scrutiny applies when a minor's fundamental rights are in the balance.

### C.

The Charlottesville curfew ordinance cannot withstand strict scrutiny and should be struck down. The Equal Protection Clause protects our constitutional rights by requiring that the government clear a high hurdle before regulating in the realm of fundamental rights. Under strict scrutiny review, "statutory classifications impinging on [a fundamental] right must be narrowly tailored to serve a compelling governmental interest." *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 666, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990); see also *Memorial Hosp. v. Maricopa County,* 415 U.S. 250, 269, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). The Charlottesville ordinance fails the strict scrutiny test, notwithstanding its stated (and worthy) objectives of (1) reducing juvenile crime, (2) promoting the safety and wellbeing of juveniles, and (3) fostering and strengthening parental responsibility.

### 1.

I quite agree with the majority that protecting the community from serious crime is a compelling governmental interest. See ante at 847–48. The problem is that the Charlottesville curfew is not narrowly tailored to forward this goal. "Statutes affecting constitutional rights must be drawn with 'precision,' and must be 'tailored' to serve their legitimate objectives.... [I]f there are

other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, [the government] may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.' " *Dunn v. Blumstein,* 405 U.S. 330, 343, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (quoting *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)).

By restricting the freedom of minors during curfew hours, the ordinance treats all minors under the age of seventeen as a threat to society in order to protect the community from juvenile crime. This broad restriction is not narrowly tailored to meet its objective of crime prevention. The ordinance treats all minors the same even though an exceedingly small percentage commit crimes. The Equal Protection Clause forbids such a crude grouping when fundamental rights are at stake, and limiting the curfew's hours and providing exceptions does not diminish this shortcoming.

This is not to say that emergency curfews that are broadly applicable and limited in duration are unconstitutional. Our circuit has previously, and properly, ruled that such emergency measures are a proper exercise of the state's police power. See, e.g., *United States v. Chalk,* 441 F.2d 1277, 1280–83 (4th Cir.1971). Here, however, we have a curfew with no sunset provision—a curfew that sweeps in a vast class, all minors under seventeen, most of whom are law-abiding. The Equal Protection Clause does not permit such a broad segment of society to be kept off the streets every night with the simple generalization, "We want to prevent crime." Narrow tailoring requires something less drastic.

### 2.

The City's second objective of promoting the safety and well-being of juveniles also falls short under strict scrutiny. This interest is not compelling in this case because the curfew displaces parental authority. Indeed, the majority says only that the City has a "strong" interest in protecting the youngest members of society from harm. See ante at 847–48. "Strong" interests are not sufficient to satisfy strict scrutiny. Only compelling interests suffice.

The City's stated interest in protecting minors under the age of seventeen is not compelling here because the curfew was not designed to be supportive of the parental role. *Bellotti II* recognized that "restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for ... full growth and maturity" and therefore can justify an increased governmental authority to regulate the protected activities of minors. See 443 U.S. at 638–39, 99 S.Ct. 3035 (emphasis added). This authority can be present when the governmental interest in regulation complements the traditional authority of the parent. By supporting the exercise of parental discretion, the state aligns its regulatory power with the interests of parents who have broad discretion to control the activities of their children. The combined interests of parents and the state therefore strengthen the justification for governmental regulation. *Ginsberg*, for example, prohibited the direct sale of pornographic magazines to minors in order to strengthen parents' control over their children's access to such material. See 390 U.S. at 631, 639, 88 S.Ct. 1274. The Court was careful to note, however, that the government did not displace parental authority: "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children." See *id.* at 639, 88 S.Ct. 1274; see also *Reno v. ACLU*, 117 S.Ct. at 2346–48. Laws like the one in *Ginsberg* may thus be justified because they defer to parental authority and decisionmaking.

The Charlottesville ordinance, however, paternalistically displaces the exercise of parental discretion by making it illegal for parents to allow their children to move about independently at night. Yet parents are better able to assess their children's maturity and capacity for judgment than a city council. Parents may legitimately decide that the best way to raise their children is to permit them to be out on their own after midnight on occasion. See *Nunez*, 114 F.3d at 952. In other words, parents may legitimately conclude that the risk of granting children some independence is small compared to the bene-

fits resulting from the gradual development of maturity and judgment that is needed in preparation for a responsible adult life. This exercise of parental discretion is impossible under the ordinance. [FN9]

> FN9. The curfew's sixth exception allows a minor to run an "errand" for his parent if he carries a signed document meeting nine statutory criteria. See City Code § 17–7(b)(6). This rigid exception, with its bureaucratic demand for detail, does not afford parents the discretion to allow their children to operate with any degree of independence. See supra note 1 (listing nine requirements).

Indeed, the ordinance was purposefully designed to displace parental discretion with the will of the City Council. On the day the curfew was enacted, the Council's agenda said the following about the curfew's purpose: "parental responsibility for the whereabouts of their children is the norm and where that does not exist, then the legal sanction should enforce such responsibility. Further, well communicated curfew ordinances ... impose a community-wide standard on parents who are unable or unwilling to set such limits." (Emphasis added). Rather than supporting the parental role, this curfew supersedes it. It reflects the "statist notion that governmental power should supersede parental authority in all cases because some parents" fail to exercise control over their children. See *Parham*, 442 U.S. at 603, 99 S.Ct. 2493. This governmental paternalism is "repugnant to American tradition." *Id.* Consequently, because the curfew attempts to achieve its stated purpose of promoting the safety and well-being of minors by displacing parental authority over the upbringing of children, the curfew does not serve a compelling governmental interest.

3.

It follows that the ordinance's third stated purpose of fostering and strengthening parental responsibility also falls short. *Ginsberg* and *Bellotti II* recognize that laws "supportive of the parental role," *Bellotti II*, 443 U.S. at 638, 99 S.Ct. 3035 (emphasis added), may justify some limitation on the constitu-

tional rights of minors. However, when laws displace the primacy of parental discretion by imposing community-wide norms, the traditional authority of parents over child rearing is no longer available to support any limitation on the rights of minors. The curfew's attempt to foster and strengthen parental responsibility by displacing parental authority does not support a compelling state interest.

For these reasons, I would hold that the Charlottesville curfew fails to satisfy strict scrutiny and thus violates the Equal Protection Clause.

### III.

Even if I could conclude that Charlottesville's curfew passed strict scrutiny, I would hold that the ordinance as adopted is void for vagueness under the Due Process Clause. More specifically, I would hold that the ordinance's First Amendment "exception" is impermissibly vague.

### A.

The vagueness doctrine of the Due Process Clause "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Although due process requires that a statute satisfy both requirements, the second is of special importance: " 'a legislature [must] establish minimal guidelines to govern law enforcement' " and prevent arbitrary enforcement. See *id.* at 357–58, 103 S.Ct. 1855 (citation omitted). When statutory language lacks sufficient "definiteness or certainty of expression," *id.* at 357, 103 S.Ct. 1855, enforcement of the law is left to the purely subjective decisions of the police, prosecutors, and juries. See *id.* at 358, 103 S.Ct. 1855; *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). Our Constitution's guarantee of due process of law makes this unacceptable. As the Supreme Court recognized a long time ago,

"It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of government."

*Kolender*, 461 U.S. at 358 n. 7, 103 S.Ct. 1855 (quoting *United States v. Reese*, 92 U.S. 214, 221, 23 L.Ed. 563 (1875)). In other words, "[w]ell-intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law." *Baggett v. Bullitt*, 377 U.S. 360, 373, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). The law itself must draw a sufficiently clear line between the legal and the illegal for both our police and our citizens.

### B.

Vagueness challenges may be brought against a statute "on its face" without regard to specific conduct, "as applied" to the plaintiff's conduct, or on both grounds. Facial challenges strike at the heart of the statute, and, if successful, invalidate any and all application of the challenged provision until it is given a construction that sufficiently clarifies it. See *Steffel v. Thompson*, 415 U.S. 452, 474, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); cf. *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (as applied). I therefore agree with the majority that facial invalidity on vagueness grounds is strong medicine that is to be administered infrequently. See ante at 853. I disagree, however, with the majority's apparent belief that courts have discretion to avoid invalidating a facially unconstitutional statute. Cf. *id.* ("It is preferable for courts to demonstrate restraint by entertaining challenges to applications of a law as those challenges arise"). Courts rarely invalidate a law for facial vagueness. This is not because courts exercise discretionary restraint but because few facial challenges satisfy the high burden normally imposed. As a general rule, a law is vague on its face "only if [it] is impermissibly vague in all of its applications." See *Hoff-*

*man Estates,* 455 U.S. at 495 & n. 7, 102 S.Ct. 1186.

What the majority ignores is the exception to this general rule: when "a law reaches 'a substantial amount of constitutionally protected conduct,'" facial vagueness challenges are "permit[ted]" and a plaintiff may attack the law "'as being vague as applied to conduct other than his own.'" See *Kolender,* 461 U.S. at 358 & n. 8, 103 S.Ct. 1855 (citations omitted) (First Amendment rights and freedom of movement affected by regulation of loitering and wandering); see also *Hoffman Estates,* 455 U.S. at 494–95, 102 S.Ct. 1186 (recognizing that general rule applies only to statutes that "implicate [ ] no constitutionally protected conduct" (emphasis added)); *Gooding v. Wilson,* 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Aptheker v. Secretary of State,* 378 U.S. 500, 517, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (facial challenge to law restricting international travel). This exception is "logically related and similar" to the doctrine of substantial overbreadth, see *Kolender,* 461 U.S. at 358 n. 8, 103 S.Ct. 1855, in that it is necessitated by the chilling effect that vague laws can have on the exercise of protected freedoms. As the Supreme Court has explained,

> The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.

*NAACP v. Button,* 371 U.S. 415, 432–33, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (citations and footnote omitted); see also *Keyishian v. Board of Regents,* 385 U.S. 589, 604, 609, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ("The danger of [a] chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform [individuals] what is being proscribed."); *Kolender,* 461 U.S. at 358 n. 8, 103 S.Ct. 1855 (citing *Button* and *Keyishian* to support exception to general rule). Especially, then, when chilling effects are a danger and a "substantial amount" of protected activity is implicated, facial challenges must be permitted. In other words, we do not have to wait for case-by-case judicial review of particular applications of the law.

Because the City's curfew regulates a substantial amount of protected activity, I would hold that it is subject to a facial challenge. The Supreme Court's decision in *Kolender* all but mandates this conclusion. In *Kolender* the Court held that a California loitering statute was unconstitutionally vague on its face. The law made it a crime for persons who "loiter or wander on the streets" to fail to provide "credible and reliable" identification when a peace officer requests it under circumstances that would justify a *Terry* stop. See 461 U.S. at 353, 357, 103 S.Ct. 1855. See generally *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and later cases. The Court permitted a facial challenge because it found that the "law reache[d] a substantial amount of constitutionally protected conduct," see *Kolender,* 461 U.S. at 358 n. 8, 103 S.Ct. 1855 (internal quotation marks omitted), notwithstanding the dissenting argument that the law was not "impermissibly vague in all of its applications" and could not be facially attacked because it had an "unmistakable core that a reasonable person would know is forbidden," *id.* at 370, 371–72, 103 S.Ct. 1855 (emphasis added). The concern that led the Court to allow the facial challenge was the law's "'potential for arbitrarily suppressing First Amendment liberties'" and the "constitutional right to freedom of movement." See *id.* at 358, 103 S.Ct. 1855 (quoting *Shuttlesworth v. Birmingham,* 382 U.S. 87, 90, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965)). The same concerns underlie the curfew in this case. The main difference is Charlottesville's First Amendment "exception," but, as I explain below, this exception is itself impermissibly vague

and therefore cannot save the statute from a facial challenge. Indeed, the need in this case for facial review is even stronger than that in *Kolender* because the curfew ordinance applies to all lawabiding minors under the age of seventeen. The law in *Kolender*, by contrast, required credible and reliable identification only when peace officers had already made a justifiable *Terry* stop, that is, after they had temporarily detained a suspect because of "a reasonable and articulable suspicion that the person seized [wa]s engaged in criminal activity," *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam) (following *Terry*). Accordingly, *Kolender* makes clear that a facial challenge is appropriate in this case.

The majority errs in asserting that because "core First Amendment activities" are protected by the ordinance, "marginal cases" may be challenged as the statute is applied, see ante at 854. Even assuming that "core" activities are protected, this argument appears to parallel the dissenting view rejected by *Kolender*. The proper inquiry is not whether some core values are protected but whether the curfew "reaches 'a substantial amount of constitutionally protected conduct,'" *Kolender*, 461 U.S. at 358 n. 8, 103 S.Ct. 1855 (quoting *Hoffman*, 455 U.S. at 494, 102 S.Ct. 1186). The First Amendment protects a substantial amount of conduct in addition to "political protest and religious worship," ante at 854, and the vagueness doctrine must be applied to protect these rights. [FN10] Deferring review for as-applied challenges impermissibly risks chilling the exercise of a substantial amount of constitutionally protected activity. Cf. *11126 Baltimore Blvd., Inc. v. Prince George's County*, 58 F.3d 988, 993–94 (4th Cir.1995) (en banc) (ruling that "courts must permit" facial challenge when there is significant risk of chilling First Amendment speech because chill "'can be effectively alleviated only through a facial challenge'" (quoting *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988))). I now turn to why Charlottesville's curfew is void for vagueness.

FN10. The majority's citations to *Hoffman Estates* do not support the conclusion that federal courts may wait for as-applied challenges in "marginal cases," see ante at 854. *Hoffman Estates* clearly limits its analysis to those cases in which "no constitutionally protected conduct" is implicated by the challenged law. See 455 U.S. at 494–95, 497, 102 S.Ct. 1186; *Kolender*, 461 U.S. at 358 n. 8, 103 S.Ct. at 1859. A wait-and-see approach is justified only when there is no risk of chilling a substantial amount of protected activity.

### C.

"A law is considered [unconstitutionally] vague if 'a person of normal intelligence must guess at its meaning and differ as to its application.'" *Elliott v. Administrator, Animal & Plant Health Inspection Serv.*, 990 F.2d 140, 145 (4th Cir.1993) (quoting *Connally v. General Constr.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)); see also *United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997) (unanimous decision); *Roberts v. United States Jaycees*, 468 U.S. 609, 629, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Although this standard applies generally to vagueness challenges, "[t]he degree of vagueness that the Constitution tolerates ... depends in part on the nature of the enactment," *Hoffman Estates*, 455 U.S. at 498, 102 S.Ct. 1186. When a statute involves the "economic regulation" of business, it is "subject to a less strict vagueness test." *Id.* at 498, 102 S.Ct. 1186. Similarly, if a law includes a scienter requirement, this too will relax the degree of clarity required because scienter can "mitigate a law's vagueness." See *id.* at 499, 102 S.Ct. 1186. On the other hand, "the standard of certainty is higher" for statutes that impose criminal, as opposed to civil, sanctions. See *Kolender*, 461 U.S. at 358 n. 8, 103 S.Ct. 1855; *Hoffman Estates*, supra at 498–99, 102 S.Ct. 1186. The last and "most important factor affecting the [degree of] clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Id.* at 499, 102 S.Ct. 1186. If it does, "a more stringent vagueness test should apply" so that protect-

ed activity will not be chilled. See *id.*; see also *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."); *Grayned,* 408 U.S. at 109, 92 S.Ct. 2294 ("[W]here a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'" (second and third alterations in original)); *Button,* 371 U.S. at 432, 83 S.Ct. 328 (standard is "strict in the area of free expression"). These factors all point to the conclusion that the Charlottesville curfew must be evaluated for vagueness under a strict standard. Under that standard, I would hold that the ordinance's First Amendment exception violates the Due Process Clause. [FN11]

> FN11. Federal courts do not look simply to the statutory language to determine if the law is vague. If a federal statute is involved, a federal court may construe the disputed provision to remove its vagueness. See *United States v. 12 200–ft. Reels of Super 8mm. Film,* 413 U.S. 123, 130 n. 7, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); cf. *CISPES v. FBI,* 770 F.2d 468, 473–75 (5th Cir.1985) (construing federal statute to avoid overbreadth). Likewise, when a state provision is challenged as vague on its face, a federal court must "'consider any limiting construction that a state court or enforcement agency has proffered.'" See *Ward v. Rock Against Racism,* 491 U.S. 781, 795–96, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Hoffman Estates,* 455 U.S. at 494 n. 5, 102 S.Ct. 1186). If no narrowing interpretation is provided by the state, however, a federal court is "without power to remedy the [statute's] defects by giving [it] constitutionally precise content." See *Hynes v. Mayor of Oradell,* 425 U.S. 610, 622, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); see also *Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

## D.

The last of the curfew's eight statutory exceptions allows a minor to remain in public during curfew hours when "the minor is exercising First Amendment rights protected by the United States Constitution, such as the free exercise of religion, freedom of speech and the right of assembly." City Code § 17–7(b)(8). Because this exception operates in an area of protected conduct, it must satisfy a strict vagueness standard so as not to chill the exercise of constitutional rights. Under this standard, the curfew's First Amendment "exception" makes the ordinance impermissibly vague. By defining the exception in vague and ambiguous terms, the ordinance impermissibly forces persons of normal intelligence to guess as to what conduct is illegal and fails to provide minimal guidelines for law enforcement.

The vagueness of the First Amendment exception is intuitively plain. Indeed, its language is anything but clear. What are "First Amendment rights"? What is considered to be "speech"? Does it include written communication? What of expressive conduct that does not involve oral or written communication? What types of speech are "protected" by "freedom of speech"? Is commercial speech protected? If so, to what extent? What is the "free exercise" of religion? And what of the "right of assembly"? Do two friends have the "right" to "assemble" or meet at a coffeehouse? This says nothing of the general First Amendment rights (e.g., association, press, petition) that the City's exception leaves unmentioned. The questions above are difficult enough for courts, Congress, and constitutional scholars, let alone for someone with no legal training. And when answers are given, they are often imprecise and turn on the specifics of a case and a balancing of many factors. Furthermore, First Amendment jurisprudence is a vast and complicated body of law that grows with each passing day. As a result, criminal conduct cannot be defined by simply referring to the title (First Amendment) or subtitle (speech or assembly) of a particular right.

Although the Supreme Court has not addressed the First Amendment issue before us, its decisions involving statutes that define

criminal conduct by referring to the principles of constitutional "due process" and "equal protection" are instructive. Like the First Amendment principles of "freedom of speech" and the "free exercise of religion," due process and equal protection are complicated and nuanced constitutional concepts that are not susceptible to general definition. The existence of these rights likewise depends on the specifics of a case and a balancing of the interests involved. As I will show, the Supreme Court's opinions in *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (plurality opinion), *United States v. Guest,* 383 U.S. 745, 753–55, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), and later cases demonstrate that constitutional "due process" and "equal protection" are inherently too vague to be used to define criminal conduct without a carefully defined scienter requirement. This applies with at least as much, if not more, force to Charlottesville's mention of the First Amendment to define criminal conduct by way of exception.

In *Screws* the Court upheld a statute under which several law enforcement officers had been convicted of illegally depriving a prisoner of his life without "due process" of law. See 325 U.S. at 93, 100, 65 S.Ct. 1031. The defendants were prosecuted under 18 U.S.C. § 20, [FN12] which made it illegal to " 'willfully' " deprive another " 'of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States' " under the color of state law. See *id.* They argued to the Court that this provision was impermissibly vague as applied to their convictions for depriving the deceased of "due process" because the law provided "no ascertainable standard of guilt." See *id.* at 94–95, 65 S.Ct. 1031. Justice Douglas, writing for a four-justice plurality, said that

> FN12. 18 U.S.C. § 20 was the predecessor to 18 U.S.C. § 242, discussed infra.

the decisions of the courts are, to be sure, a source of reference for ascertaining the specific content of the concept of due process. But even so the Act would incorporate by reference a large body of changing and uncertain law. That law is not always reducible to specific rules, is expressible only in general terms, and turns many times on the facts of a particular case. Accordingly, it is argued that such a body of legal principles lacks the basic specificity necessary for criminal statutes under our system of government. Congress did not define what it desired to punish but referred the citizen to a comprehensive law library in order to ascertain what acts were prohibited. To enforce such a statute would be like sanctioning the practice of Caligula who "published the law, but it was written in a very small hand, and posted up in a corner, so that no one could make a copy of it."

*Id.* at 96, 65 S.Ct. 1031 (quoting Suetonius, Lives of the Twelve Caesars 278). Indeed, seven justices indicated that § 20's use of "due process" to define criminal conduct would have been unconstitutionally vague without something else to mitigate its ambiguous incorporation of constitutional principles. See *id.* at 105, 65 S.Ct. 1031 (§ 20 must be construed with narrow scienter requirement to "avoid grave constitutional questions"); *id.* at 149–50, 65 S.Ct. 1031 (Roberts, J., dissenting) ("[a]ll but two" justices agreed on this issue). However, the plurality concluded that the statute could be saved by construing "willfully" to require a specific intent to purposefully deprive another of a specific federal right made definite by the express terms of the Constitution and laws of the United States or by the decisions interpreting them. See *id.* at 100–05, 65 S.Ct. 1031. Thus, *Screws* "recognized that the expansive language of due process that provides a basis for judicial review is, when incorporated by reference into § 242, generally ill-suited to the far different task of giving fair warning about the scope of criminal liability," *Lanier,* 117 S.Ct. at 1225 (unanimous decision), but that the use of a strict scienter requirement could sufficiently mitigate this ambiguity.

The Court in Guest relied on *Screws* to reject a similar vagueness challenge to a prosecution for conspiracy to deprive black citizens of rights protected by the Equal Protection Clause. The Court again emphasized that the specific intent requirement of 18 U.S.C. § 241, like that of § 242, removed

the problem of the statute's vagueness. See *Guest,* 383 U.S. at 753–54, 86 S.Ct. 1170; *id.* at 785, 86 S.Ct. 1170 (Brennan, J., concurring in part) (incorporation of constitutional provisions "brings § 241 close to the danger line of being void for vagueness" but "stringent scienter requirement saves [it] from condemnation"); see also *United States v. Kozminski,* 487 U.S. 931, 941, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988) (tension between requirement of "definite standard of guilt" and "incorporat[ion] by reference a large body of potentially evolving federal law" is resolved with strict scienter requirement).

Recently, a unanimous Supreme Court in *Lanier* reiterated the principles established in *Screws* and *Guest.* The Court again recognized that "in lieu of describing the specific conduct it forbids, [the] general terms [of §§ 241 and 242] incorporate constitutional law by reference. . . . The result is that neither the statutes nor a good many of their constitutional referents delineate the range of forbidden conduct with particularity." *Id.* at 1224. Consequently, this "affront to the [due process] requirement" of fair notice is made permissible only when "willful violators" deprive (or conspire to deprive) others of rights that "have been 'made specific' by the text or settled interpretations." See *id.* at 1225 (quoting *Screws,* 325 U.S. at 105, 65 S.Ct. 1031). "[W]illful violators 'certainly are in no position to say that they had no adequate advance notice'" of the definition of the crime. *Id.* (quoting *Screws,* 325 U.S. at 105, 65 S.Ct. 1031).

Like the statutes in *Screws, Guest,* and *Lanier,* the Charlottesville curfew's First Amendment exception incorporates a large and growing body of law that is not reducible to specific rules and that turn on a balancing of numerous factors. Unlike the federal statutes, however, the City's curfew ordinance has no scienter requirement that could mitigate the inherent vagueness of First Amendment jurisprudence. Most important, though, the curfew regulates in areas involving constitutionally protected activity, while §§ 241 and 242 do not. In fact, those sections are designed to punish those who willfully deprive and conspire to deprive others

of constitutional rights, as, for example, in *United States v. Lanier,* where the defendant, a state judge, sexually assaulted (in his office) several employees and others who had business before him. *Lanier,* 117 S.Ct. at 1222–23. Such conduct lies far outside of the realm of constitutionally protected action, and therefore §§ 241 and 242 do not have to meet the strict vagueness standard that applies when protected activity is involved. The curfew, however, does. Consequently, the ordinance must survive scrutiny under a vagueness standard much more strict than that applied in *Screws* and *Guest.* Under that standard and in light of the absence of a scienter element capable of saving the ordinance, I would hold that the First Amendment exception and the ordinance are void for vagueness. [FN13]

> FN13. The majority misses the mark when it says that a scienter requirement would necessarily expand, and not narrow, the breadth of Charlottesville's curfew because subsection (b)(8) "provides an exception from liability" and does not affirmatively define criminal conduct. See ante at 853 n. *. The curfew ordinance uses section (b) and its eight exceptions to define what conduct is illegal. See City Code § 17–7(b). With respect to subsection (b)(8) in particular, the ordinance makes it a crime for minors to remain in public when not exercising First Amendment rights. See id. § 17–7(b), (b)(8). Subsection (b)(8) thus plainly incorporates the First Amendment to define the scope of criminal conduct. Even when a law is drafted to include exceptions in defining the crime, a scienter element that is applied to the criminal provision as a whole (and not just its exceptions) can reduce the objectionable vagueness of the law.

The testimony of Charlottesville's Chief of Police proves the statute's ambiguity. When asked whether two fifteen-year-olds violate the ordinance by discussing politics in a coffee shop during the curfew, the Chief said, "You're indoors, it's a public location, I . . . think technically under the ordinance it may be a violation. I doubt whether we would deal with it." Similarly, when asked if a fifteen-year-old who plays in a band in a local

restaurant after curfew hours violates the curfew when he is not paid for the performance, the Chief answered, "I think that technically [the minor] is possibl[y] in violation of the ordinance." However, "the officer would obviously have to make a decision about whether they're in violation or not. And I believe there's some discretion allowed." It is this discretion combined with the failure to define with specificity what conduct is illegal that makes the statute unconstitutional. The danger of chilling the exercise of constitutionally protected activity arises because of the uncertainty associated with the First Amendment exception. [FN14]

> FN14.. It is of no constitutional consequence that the Chief testified that "if there's a question [as to whether the First Amendment exception applied,] we would go down on the side that it was a valid Constitutional kind of activity" and "would consult with the Commonwealth Attorney or the city attorney's office to see whether it was or not." "Well-intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law." *Baggett,* 377 U.S. at 373, 84 S.Ct. 1316.

The majority errs in supporting its reasoning with the fact that city councils appear to be placed "between a rock and a hard place," ante at 853–54. While it is true that curfews without exceptions will almost always impermissibly infringe upon substantive constitutional rights and that curfews with exceptions may be subject to vagueness challenges, invalidation of this ordinance is still mandated by our Constitution. "Our Constitution is designed to maximize individual freedoms within a framework of ordered liberty. Statutory limitations on those freedoms are examined for substantive authority and content as well as for definiteness or certainty of expression." *Kolender,* 461 U.S. at 357, 103 S.Ct. 1855 (emphasis added); see also *Nunez v. City of San Diego,* 114 F.3d 935, 943–44 (9th Cir.1997) (recognizing that interpreting curfew to avoid vagueness problems under Due Process Clause "may make it more difficult for the statute to pass constitutional muster on substantive grounds"). "[L]egislative bodies in draftsmanship obviously have the same difficulty as do the judicial in interpretation. Nevertheless despite the difficulties, courts must do their best to determine whether or not the vagueness is of such a character 'that men of common intelligence must necessarily guess at its meaning.'" *Winters v. New York,* 333 U.S. 507, 518, 68 S.Ct. 665, 92 L.Ed. 840 (1948); see also *Kingsley Int'l Pictures Corp. v. Regents of the Univ.,* 360 U.S. 684, 694, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959) (Frankfurter, J., concurring). Although we may "appreciate the difficulties of drafting precise laws," we must require that all statutes meet constitutional standards for clarity. See *City of Houston v. Hill,* 482 U.S. 451, 465, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). If we did otherwise, we would forgo our duty to enforce the mandates of the Due Process Clause. [FN15]

> FN15. I also disagree with the majority's claim that the First Amendment exception "fortifies, rather than weakens, First Amendment values." See ante at 853–54. Because First Amendment rights can never be diminished by a city ordinance, see U.S. Const. art. VI, cl. 2, the City's exception does nothing but restate a well-settled constitutional restriction on its substantive regulatory authority. Indeed, the majority's citation to *CISPES v. FBI,* 770 F.2d 468 (5th Cir.1985), contradicts its position. Cf. ante at 853–54. *CISPES* recognized that "such a provision cannot substantively operate to save an otherwise invalid statute." See 770 F.2d at 474. A statement similar to the First Amendment exception in this case, however, was used by the Fifth Circuit to determine Congressional intent and guide its construction of the provision to avoid substantial overbreadth. See *id.* Here, though, we are faced with a local, not a federal, statute, and therefore we are without the authority to provide a limiting construction that might save the ordinance. See *Hynes,* 425 U.S. at 622, 96 S.Ct. 1755. The First Amendment exception thus does little to advance First Amendment values.

Taken to its logical conclusion, the majority's reasoning would immunize all statutes regulating conduct involving the exercise of First Amendment rights whenever they contain a First Amendment "exception." Because such provisions would not be impermissibly vague under the majority's analysis, the statutes would be immune from both substantive and vagueness challenges. Substantively the statute cannot, according to its own terms, violate the constitution. In fact, it incorporates the Constitution's protections. The upshot is that facial attacks could never be brought and that statutes containing these exceptions could be challenged only as they are applied. This squarely conflicts with the Supreme Court's longstanding concern with the potential chill of constitutionally protected activity created by the mere existence of vague criminal statutes and the potential for their arbitrary enforcement.

For these reasons, I would hold that the curfew's First Amendment "exception" renders the ordinance impermissibly vague on its face. Until the ordinance is amended by the City Council or given a construction by state courts that sufficiently reduces its unconstitutional vagueness, its enforcement conflicts with the constitutional guarantee of due process of law.

### IV.

In sum, I would hold that equal protection challenges by minors to laws that regulate in the area of fundamental rights must be subject to strict scrutiny. In my opinion the Charlottesville ordinance fails this standard. Even if the ordinance survived the equal protection challenge, however, it would be unconstitutional in its present form. The curfew's First Amendment exception is impermissibly vague in violation of the Due Process Clause. For these reasons, I respectfully dissent.